THE KOPPERS COAL COMPANY *v.* GEORGE P. ALDERSON, *State Tax Commissioner, etc.*

(No. 9438)

Submitted April 13, 1943. Decided June 1, 1943.

FOX, JUDGE, absent.

KENNA, JUDGE, dissenting.

*Ira J. Partlow,* Acting Attorney General, and *Kenneth*

*E. Hines,* Assistant Attorney General, for appellant.
*Arthur S. Dayton,* for appellee.

ROSE, JUDGE:

We have for determination in this case the problem whether the payments stipulated for in a "Deed of Lease" dated July 1, 1938, from The Koppers Coal Company to Imperial Colliery Company, covering four tracts aggregating four thousand acres of coal land in Kanawha and Fayette Counties, constitute income of such character, as to authorize a tax against the Koppers Company under Section 2i of Chapter 86, Acts of the Legislature 1935, under which it has been actually taxed by the authorities of the State since the date of this instrument. The appellee, The Koppers Coal Company, would have us declare that this income is in the nature of payments for the sale of coal and, that therefore, the tax should be levied under section 2c of that chapter.

The sections of the statute referred to are as follows:

"Section 2c: Upon every person engaging or continuing within this state in the business of selling any tangible property whatsoever, real or personal, * * * there is likewise hereby levied, and shall be collected, a tax equivalent to one-half of one per cent of the gross income of the business, except that in the case of a wholesaler or jobber, the tax shall be equal to fifteen one-hundredths of one per cent of the gross income of the business".

"Section 2i: Upon every person engaging or continuing within this state in the business of collecting incomes from the use of real or personal property or of any interest therein, whether by lease, conveyance or otherwise, and whether the return be in the form of rentals, royalties, fees, interest or otherwise, the tax shall be one per cent of the gross income of any such activity: * * * * ".

The appellee has, from the date of this "lease", made payments of tax in accordance with the assessments of

the state tax commissioner, protesting nevertheless that they were incorrect. For the quarter ending June 30, 1940, it tendered as taxes the sum of $16.51, being the amount which it considered to be due if the assessment were made under Section 2c, but, the tax commissioner, declining to receive this sum as payment in full, the additional sum of $16.51 was paid under protest. This suit was then instituted in the Circuit Court of Kanawha County, to compel the tax commissioner to refund the alleged excess of $16.51, to obtain an accounting for excess taxes claimed theretofore to have been paid and the application of such excess as credit on future taxes to become due, to enjoin the tax commissioner from collecting from appellee any further taxes under Section 2i, and to have a decretal pronouncement by the court that the payments under said lease are properly taxable under Section 2c.

The appellant tax commissioner demurred to the bill of complaint on the ground, in substance, that the bill itself showed that the payments in question were properly taxable under Section 2i. This demurrer was overruled, and the cause was then submitted upon the bill, exhibits and certain stipulations, and a final decree was entered substantially in conformity with the prayer of the bill of complaint. We then granted this appeal.

A paragraph in the lease provides that, "It is understood and agreed that all of the coal in all of the veins or seams within the boundaries of the lands subject to this lease, which the lessee is obligated or shall elect to mine and remove hereunder, shall be mined and removed by Lessee". Another has this provision: "The Lessor hereby covenants to and with the Lessee that it will warrant generally the property, rights, privileges and easements hereby leased". The payments for coal produced are based upon a stipulated sum for each gross ton of the coal so mined or manufactured into coke. In *Bankers Pocahontas Coal Co.* v. *Central Pocahontas Coal Co.*, 113 W. Va. 1, 166 S. E. 491, this Court held that an instrument by which the owner of coal lands authorized another to re-

move coal therefrom and to pay for what is removed or improperly left in the mine, was a lease; and added, as dictum, apparently, that if such an instrument obligated the grantee to mine and pay for all the coal, the transaction would constitute a sale thereof. Numerous decisions from other jurisdictions make the same distinction. But the analysis of the present lease is not so simple, and the mere labeling of the instrument will not necessarily be decisive of the issues involved.

In the present lease, the lessor vested in the lessee the right to mine and remove coal, but is there cast upon the lessee an absolute obligation so to do? It is true that it is provided that all the coal affected by the lease (with certain specific exceptions) "shall be mined and removed by Lessee"; but a subsequent paragraph has this provision: "The Lessee shall at all times energetically open, develop and keep up its operations, in order that, so long as fair prices are obtainable, its capacity for mining and preparing and shipping coal or coke or other products of coal shall be sufficient to meet the demands and requirements of the market to the extent that the same can be reasonably done hereunder". This is a clear modification of the absolute right and duty to remove all coal. The lessee is only required to mine, prepare and ship coal and coke to meet the demands and requirements of the market, so far as the same can be reasonably done. Suppose that for a period there should be no market, for this coal, or that the market should wholly and permanently cease, what then will be the rights and obligations of the parties? In view of these possibilities, can we say that this lease requires absolutely the removal of all coal and thus becomes a sale?

We note, further, that the instrument speaks of itself as a lease; that the parties are therein called lessor and lessee; that the lessor expressly purports to "let and lease * * * all of the coal in all of the veins or seams of coal in, on or underlying" the tracts of land described; that the instrument further provides that the "lessor also lets and leases" to the lessee certain "rights and priv-

ileges", which include the sole and exclusive right and privilege of mining and removing all of the coal involved, of manufacturing coke therefrom and transporting and shipping the same in and across the land, of occupying a sufficient amount of the surface, of using sand and water for the mining of coal and manufacture of coal, of using certain timber on the land, and of transporting coal from other lands through and over the parcels described in the present lease; that a fixed term of thirty years is established in the instrument, subject, however, to continuance for successive periods of thirty years until all the coal shall have been mined; that a payment of $833.33 per month as "minimum rental" must be made by the lessee whether any coal is, in fact, mined or not; that the lessor reserves the title to the land mentioned in the lease; that the lessor must pay the taxes upon the "demised premises" and all its own property thereon, and on all improvements placed thereon by the lessee, except those on one designated tract which shall be paid by the lessee to the amount of $300.00 per year; that the lessor shall have for the collection of the payments due under the lease all of the remedies provided now or hereafter by the laws of the State for the collection of rents by a landlord from a tenant; and that the lessor for nonperformance of the lease in a specified degree shall have the right to reenter and thereby to terminate the lease and thereafter hold the premises in all respects as if the lease had not been executed. These elements in the instrument are the earmarks of a lease.

We think, however, that it is not necessary to a determination of this controversy to classify this instrument as exclusively either a conveyance or a lease. It is apparent that it embodies many of the qualities of each. For some purposes it should be construed as a sale; in other aspects it would be more properly treated as a lease. This composite character is peculiar to all coal mining leases. The mere labeling of the instrument as one or the other aids us not at all in the solution of the problem here presented, for the reason that by the very

language of Section 2i it is provided that the person in the business of collecting the incomes therein enumerated shall be subject to the tax there stipulated whether such incomes arise "by lease, conveyance, or otherwise".

Our attention is called to the fact that at the 1943 session of the Legislature, an amendment to Section 2i was submitted for enactment and rejected, which would have directly embodied in the statute the construction which the tax commissioner has given to the statute as it originally stood. It is urged that this shows a legislative interpretation of the statute adverse to that of the tax commissioner, and that the fact that the section was actually reenacted without including the amendment offered indicates a legislative intent that this interpretation should not be the law.

We are not inclined to give this legislative history decisive weight in construing the statute under consideration. Ordinarily, subsequent acts of the legislature cast no light on the intent of the legislature which originally enacted a statute. Moreover, the proposed amendment may have been rejected because the last legislative body regarded the tax commissioner's construction as correct and the proposed amendment, therefore, superfluous.

Nor is the continued administrative interpretation and application of this statute to this and other coal mining leases of much aid to us. The appellee did not supinely submit to, or acquiesce in, the decisions of the tax commissioner, nor does a similar application of the statute to other coal mining leases, differing perhaps from the present one, cast any light on the question here to be answered. This lease between The Koppers Coal Company and Imperial Colliery Company and the character of the payments made thereunder must be appraised from the instrument itself and the applicability of the statute must be determined as it stood when the assessment was made.

Section 2i enumerates specifically rents, royalties, fees and interest as types of income which are covered thereby. If the payments provided for in the present lease are rents, no question can possibly arise as to their being

included in this section. If they are royalties, they, too, are directly enumerated. The meaning of the term "royalty" is well understood. As applied to the mining industry it is a payment to the owner of minerals in place for the privilege of removing and appropriating the same, and is ordinarily based upon the quantity of the mineral produced.

Royalty, strictly speaking, is not absolutely and exclusively purchase money for minerals sold. As originally conceived it was a portion of the mineral or the payment made for the privilege of extracting minerals or for the use of a mine, or of the land, for that purpose. This concept of the term is well preserved. Bouvier's Law Dictionary (Rawle's 3rd Revision) gives this definition of the word: "A payment reserved by the grantor of a patent, mining lease, etc., and payable proportionately to the *use* made of such right". Black's Law Dictionary, 3rd Ed., defines the word thus: "A payment reserved by the grantor of a patent, lease of a mine, or similar right, and payable proportionately to the *use* made of the right by the grantee." The very word itself, therefore, embodies, historically and theoretically, not principally the element of transferring title to the mineral, but rather the basic idea of payment for the use of the mine or of the premises, with the acquisition of title to the severed mineral as incidental. The Legislature, therefore, had a basis in law and in fact for classifying royalties along with rentals, fees and interest, as income from the use of real or personal property.

Moreover, the lessee will be compelled throughout the life of the lease to pay the sum of $833.33, per month, whether any coal shall ever be produced. These payments, so made, therefore, are not in every sense payments for coal. If coal should cease to be produced, they would simply be payments for the privilege of retaining the right to mine coal and to use the other privileges granted, thus embodying no element of sale. True, such payments are by the instrument required to be credited on coal subsequently mined, but their primary purpose

is as above indicated, and only secondarily and conditionally are they ever to be applied in payment for the coal severed. And even when the amount of coal mined per month shall be such that the royalty therefor exceeds $833.33, the sum so to become due will be in payment, not only for the coal that has been removed, but also for all the rights and privileges created and vested in the lessee by the lease. While it is urged that these rights and privileges are all mere incidents to the taking out and acquiring of title to the coal, and, therefore, negligible in determining the character of the payments to be made, they are separately and distinctly leased and let by the solemn deed of the parties, and they are actually of great, though undeterminable, value. What proportion of the payments is to be construed as applicable to the coal itself, and what to the privileges likewise leased and let there is no possibility of knowing. The payments are, therefore, without any question, at least partly for the use of real estate demised. To that extent they are clearly rentals, and, therefore, unquestionably covered by section 2i rather than by section 2c of the statute.

But even if the word "royalty" should be treated as applying only to payments for minerals severed from the land, and the transfer to the lessee of title thereto, appellee's conclusion would not necessarily follow. It is not to be assumed that the word "royalties" was inserted in this statute for nothing. It will not be construed as synonymous with rentals. It plainly was intended to bring into this section some incomes which would not be covered by the other words therein, and since, under no circumstances could a strict royalty arise from realty without the taking of a part of the corpus thereof, we cannot say that royalty created by the present lease, which does pay in part for coal so taken, is for that reason, to be excluded from this section of the statute.

The question whether royalty oil and gas represents income from, or the purchase price of, the mineral has long been settled by the Supreme Court of the United States,

in so far as the Federal income taxes are concerned. Such royalties are always held to be income and not a selling price. *Burnet, Commissioner of Internal Revenue* v. *Harmel*, 287 U. S. 103, 53 S. Ct. 74, 77 L. Ed. 199; *Murphy Oil Co.* v. *Burnet, Commissioner of Internal Revenue*, 287 U. S. 299, 53 S. Ct. 161, 77 L. Ed. 318; *Herring* v. *Commissioner of Internal Revenue*, 293 U. S. 322, 55 S. Ct. 179, 79 L. Ed. 389. Oil and gas royalties, of course, are not in all respects analogous to the royalty reserved in the present coal lease, but they closely approximate the same, and the Supreme Court of the United States in the case of *Bankers Pocahontas Coal Co.* v. *Burnet, Commissioner of Internal Revenue*, 287 U. S. 308, 53 S. Ct. 150, 77 L. Ed. 325, held that the royalties received by a lessor under a coal lease in Mingo County of this State were income and not purchase money, under the income tax laws of the United States. The lease there involved was not identical with the one here under consideration, but they are elementally similar and the decision of that Court is at least strongly confirmatory of the conclusion which we have here reached. This decision of the highest court in the land is, at least substantial authority for our conclusion that the royalty under consideration is not wholly and exclusively a payment of purchase money for coal sold.

We hold, therefore, that the royalties provided in the instrument in question partake sufficiently of the character of income from the use of coal and real estate to permit their classification by the Legislature as income arising from the use rather than the sale thereof; that the Legislature has distinctly and specifically so classified the same; and that the business of continuing to collect these incomes is properly taxable under Section 2i, of Chapter 86, Acts of the Legislature 1935.

Accordingly, the decree of the Circuit Court of Kanawha County appealed from is reversed and the bill dismissed.

*Reversed.*

KENNA, JUDGE, dissenting:

The question to be decided is: as between Section 2c

of Article 13, Chapter 11, of the Code, and Section 2i of the same article, which applies more aptly to the situation created by Koppers Coal Company's executing a coal lease upon a number of tracts of land owned by it in fee, to Imperial Colliery Company, granting for the period of thirty years the exclusive right of removing all of the coal for the payment "as rent" of a "royalty" of eight to seventeen cents a gross ton, the amount differing in the various tracts? Section 2c applies to persons engaging within this State "in the business of selling any tangible property whatsoever, real or personal," and Section 2i to persons engaging within this State "in the business of collecting incomes from the use of real or personal property or of any interest therein". The first section imposes a tax of fifteen one-hundredths of one per cent of the gross income of the business, and the second a tax of one per cent, so that it naturally follows that if the two sections appear to apply equally to the transaction in question, the admittedly established rule of construing doubtful or ambiguous tax statutes favorably to the taxpayer requires the application of Code, 11-13-2c. That rule of construction requires no citation of authority to justify its statement.

It seems perfectly plain to my mind that what is commonly called a coal lease has as its one purpose the complete or partial removal of the irreplaceable corpus of the estate or land involved, and if that be so, it is rather difficult to see how it can, particularly as against the contention of a taxpayer, be treated as "the *use* of real or personal property" (underscoring supplied) as distinguished from its complete disposition by sale.

But the appellant points to two questions that he believes should be controlling: first, that Koppers has executed a lease in which was reserved "a royalty", expressly named in a qualifying clause of Section 2i, that could be paid as "rent"; and, second, that the grantors in coal mining leases in West Virginia have uniformly exercised the rights of a landlord and resorted to the

remedies accorded to a person who had leased real property.

Dealing first with the second question, it need only be said that the remedies accorded a landlord in West Virginia are almost entirely statutory, and therefore the practice thereunder does not affect the application of the statutes now before the Court.

As a prelude to the first question, it is plain to my mind that the terms used by the taxpayer in a contract to which he is a party cannot determine the nature of the transaction for his benefit. That being so, I believe the terms should not, in collateral matters of taxation, fix the nature of the transaction to his harm.

The broad and commonly understood distinction between a sale and a rental is that a sale has as its outstanding element a transfer of title, and a rental, being compensation for a permitted use, does not. A reserved royalty originally was a part of the thing removed, the owner not parting with the title thereto, but granting to the operator the bulk of the thing to be removed, less the reserved royalty. To that extent the grant was a conveyance. It was not an actual sale in place, because the operator parted with nothing at the time. Upon the performance of his promised labor, he took in exchange and upon severance the principal part of the article severed. On the other hand, it was not a rental for there was nothing paid for any use. As a matter of fact, the term "royalty" originated from the exercise of a royal prerogative, and I think sheds very little light on the present problem. We must remember that the word "royalty" is not used as primarily descriptive in the section under consideration which imposes an occupation tax upon "the business of collecting incomes from the use of real or personal property, or of any interest therein * * * ". This is an occupation tax: not an income tax. Consequently, the word "royalty" is used to name certain general characteristics of the occupations included in the section. Under the well known maxim *ejusdem generis* (of the same class), a general term is not per-

mitted to enlarge the meaning of a preceding specific term to which it relates. Certainly a taxpayer may invoke that rule in construing a tax statute.

Another very good reason for the use of the word "royalty" is to prevent contractual terminology from controlling the effect of the statute. It is common knowledge that the sales tax was in part circumvented by nonresident manufacturers who "leased" patented machinery of various sorts for a rental that quickly totalled the sales price. Section 2i may have been intended to prevent like practices.

I cannot agree with the discussion of the meaning of the word "royalty" as concluded in the following part of the majority opinion:

> "The very word itself, therefore, embodies, historically and theoretically, not principally the element of transferring title to the mineral, but rather the basic idea of payment for the use of the mine or of the premises, with the acquisition of title to the severed mineral as incidental".

I cannot see how the use of the word "royalty", if that is its meaning, could in any way operate to expand the definitions of the occupations included in Section 2i to embrace the business of what is usually called "leasing" coal land, because in a so-called coal lease "the acquisition of title to the severed mineral" is by no means a mere incident. It is the principal, if not the sole, purpose of the contract; all else is secondary.

The Attorney General stresses the fact that a coal lease necessarily involves the use of real estate and that for that reason Section 2i can be made to apply. That can be said truthfully in varying degrees of all human occupations. But not disregarding the fact that the removal of coal does necessarily involve, as a more or less minor incident, use of real property in a proportion which, to my mind, is entirely insufficient to permit that fact to weigh in determining the nature of the transaction, it is to be iterated that to reverse it is not enough to construe Section 2i in a manner that will cause its

provisions to cover the transaction in question, but that beyond that it must be determined that the wording of that section *more nicely fits* the transaction now before us than does the wording of Section 2c, because if doubt exists as to which covers it more aptly, that doubt must be resolved in favor of Koppers, the taxpayer.

Looking then to Section 2c, we have no difficulty in finding that its terms do cover "the business of selling". It strikes me as quite plain that the marked distinction to be drawn between that business and "the business of collecting incomes from the use of real or personal property" is that the result of the first is the diminishment of the stocks on hand, or corpus, while the latter is based upon keeping intact the body of the property, its control, and ownership. In the first case, the property of the taxpayer is being disposed of for a price, and in the second it is being used and returned intact for a price. True, the articles sold in many instances are replaceable, but if that distinction is to be drawn it certainly favors the placing of a coal mine lease in the selling category because coal when once removed is obviously not replaceable.

For the foregoing reasons I have concluded that the general distinction the Legislature wished drawn between Section 2c and Section 2i is based primarily upon whether the transaction or transactions in question involve a reduction or depletion of the corpus, or capital, or whether they involve only its use and return intact. To my mind there is little doubt that Section 2c as applied to the quite lengthy so-called lease now before us fits more aptly than does Section 2i. I therefore believe that in applying Section 2i the majority has erred.

I do not believe that the general character of what is usually called a coal mining lease under the decided cases is particularly enlightening, since we are concerned only with its legal nature under the two sections of the statute now sought to be applied.

I regard it as quite unfortunate that at this time, when fuel is the backbone of war production, its disposition

by the owner is to be treated as a use, and discouraged by having the more burdensome of two doubtful tax levies placed thereon. The speculation advanced by the Attorney General that the conservation of natural resources lay behind the legislative purpose palls when the practical exigencies with which this Nation is now confronted are considered.