KIZER *v* LIVINGSTON COUNTY BOARD OF COMMISSIONERS

1. STATUTES — CONSTRUCTION — AMBIGUITY — INTERPRETATION — JUDICIAL FUNCTION.

Interpretation of a statute is a judicial function where the statutory language is susceptible of two differing interpretations and is of sufficiently indefinite meaning that reasonable minds can and do disagree as to its true construction.

2. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.

The primary duty of a court, where a statute is sufficiently ambiguous to necessitate judicial interpretation, is to ascertain the intention of the Legislature by examination of the statutory language, the subject matter under consideration, the scope and purpose of the act, other relevant statutes, and legislative history.

3. STATUTES — CONSTRUCTION —-LEGISLATIVE INTENT — LEGISLATIVE HISTORY — LEGISLATIVE JOURNALS.

One important method of determining legislative intent in cases of statutory ambiguity is to review legislative journals which chronicle the legislative history of the act in question; amendments, modifications, and changes in the frame of a bill during its passage may be considered as evidence of legislative intent.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 50 Am Jur, Statutes §§ 219, 225.
[2, 8] 50 Am Jur, Statutes § 223.
[3] 50 Am Jur, Statutes § 326 *et seq.*
[4] (no reference)
[5] 50 Am Jur, Statutes §§ 252, 253.
[6] 50 Am Jur, Statutes § 269.
[7] 50 Am Jur, Statutes §§ 358, 363, 364.
[9] 50 Am Jur, Statutes § 337.
[10] 50 Am Jur, Statutes §§ 441–443.
[11] 25 Am Jur 2d, Elections §§ 13, 15, 31.
56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions §§ 193, 195.

4. Statutes—Construction—Legislative Intent—Statutory Language.

Analysis of statutory language in the context of the entire act and its amendments gives insight into the legislative intent concerning a statutory provision which is being interpreted.

5. Statutes—Construction—Legislative Intent—Punctuation.

Punctuation is an important factor in determining legislative intent; the rules of grammar are presumed to be known by the Legislature.

6. Statutes—Construction—Doctrine of the Last Antecedent.

The doctrine of the last antecedent, a rule of statutory construction, provides that qualifying words and phrases refer solely to the last antecedent where no contrary intention appears.

7. Statutes—Construction—Legislative Intent—Surplusage.

Every word in a statute, as a general rule, is to be given force and effect; however, unnecessary words or clauses, words inadvertently or mistakenly used, words to which no meaning at all can be attached, or words having no meaning in harmony with the legislative intent as collected from the entire act are treated as surplusage and are to be wholly disregarded in the construction of the act in order to effectuate the legislative intent.

8. Statutes—Construction—Legislative Intent—Intent Upon Passage.

The ultimate intent which must be determined in interpreting an ambiguous statute is the intent existing at the time the act was passed, not the intent expressed by subsequent amendment.

9. Statutes — Construction — Legislative Intent — Subsequent Acts.

Subsequent acts of the Legislature ordinarily cast no light on the intent of the Legislature which originally enacted a statute.

10. Statutes — Construction — Amendment — Unaffected Provisions.

Parts of an amended statute not affected by the amendment will be given the same construction that they received before the amendment.

11. COUNTIES—BOARD OF COMMISSIONERS—REAPPORTIONMENT—COUN-
    TIES LESS THAN 75,000.
    The county reapportionment act granted to county boards of
    commissioners in counties having less than 75,000 population
    in 1960 an option of self-apportionment only for a period of
    30 days following the effective date of the original act in
    1967; the act did not give the county boards a decennially-
    recurring option of self-apportionment; instead, after the
    option period in the original act, the power and responsibility
    for reapportioning the boards of commissioners for those
    counties was granted exclusively to the apportionment com-
    mission of those counties (MCLA 46.401).

Appeal from Livingston, Paul R. Mahinske, J.
Submitted Division 2 January 25, 1972, at Lansing.
(Docket No. 13423.)   Decided January 26, 1972.

Complaint by Thomas Kizer, Jr., as a member of
the apportionment commission of Livingston Coun-
ty, against the Livingston County Board of Com-
missioners for a declaratory judgment that the
board of commissioners has no authority to reappor-
tion its own districts.   Judgment for plaintiff.   De-
fendant appeals.   Affirmed.

*Thomas Kizer, Jr., in propria persona.*

*John P. Conley,* Assistant Prosecuting Attorney,
for defendant.

Before: QUINN, P. J., and McGREGOR and V. J.
BRENNAN, JJ.

PER CURIAM.   On December 28, 1970, the Attorney
General addressed the following letter opinion to the
Prosecuting Attorney of Clinton County:

"You have requested my opinion as to whether
reapportioning the county board of commissioners

as required by Act 261, PA 1966 [MCLA 46.401 *et seq;* MSA 5.359(1) *et seq*], the board of commissioners in counties the population of which on the effective date of Act 261 was less than 75,000 is authorized during a period of 30 days following the publication of the latest official United States decennial census figures of the 1970 federal decennial census to adopt a plan for that purpose.

"Reference to Section 1 of Act 261 as originally enacted discloses said section contained provision therefor. That section has since been amended by Act 153, PA 1968, and Act 137, PA 1969. Each of those amendments continued such provision without change aside from change in the name of that board. The fact that the legislature in reenacting such section, as amended, continued without change such provision evidences the legislative intent that in those counties population of which was less than 75,000 on the effective date of Act 261, the board of commissioners is authorized to draft and adopt such a plan within the 30-day period following publication of the latest official figures of each decennial census."

The Secretary of State furnished the counties with the Federal census data needed to accomplish reapportionment on January 4, 1972;[1] pursuant to the foregoing opinion of the Attorney General, the Livingston County Board of Commissioners began the task of reapportionment. The Livingston County Prosecutor, a member of the apportionment commission,[2] immediately filed an action in the Livingston County Circuit Court seeking a declaratory

---

[1] MCLA 46.404(a); MSA 5.359(4)(a).

[2] The apportionment commission in each county consists of the county clerk, county treasurer, prosecuting attorney, and county chairmen of the two political parties receiving the greatest number of votes cast in the most recent secretary of state election. MCLA 46.403; MSA 5.359(3).

judgment as to the authority of the Board of Commissioners to perform the act of reapportionment. He maintained that MCLA 46.401; MSA 5.359(1) permitted the board of county commissioners in counties of less than 75,000 population in 1960 to reapportion in conformity with the one man/one vote requirements of the statute[3] and decisions of the United States Supreme Court[4] *only* in the initial reapportionment upon the effective date of the county reapportionment act;[5] thereafter, after each decennial census, the prosecutor maintained that it was the sole responsibility of the apportionment commission to complete the work of reapportionment of the board of county commissioners. The circuit court agreed and designated the apportionment commission as the proper party to reapportion Livingston County. The board of county commissioners has appealed. Because of the important nature of the issue, to the reapportionment of county commissions now being accomplished throughout the state, we have given our immediate attention to the matter.

In an effort to codify apportionment procedures sufficient to effectuate the one man/one vote principle ennunciated in *Reynolds* v *Sims*, 377 US 533; 84 S Ct 1362; 12 L Ed 2d 506 (1964), and possibly to anticipate *Avery* v *Midland County*, 390 US 474; 88 S Ct 1114; 20 L Ed 2d 45 (1968), the Michigan Legislature adopted 1966 PA 261 (hereinafter cited as the County Apportionment Act). This act provided

[3] Section 46.404(a) provides that all districts shall be "as nearly of equal population as is practicable".

[4] *Avery* v *Midland County*, 390 US 474; 88 S Ct 1114; 29 L Ed 2d 45 (1968), being the most germane to the county apportionment statute.

[5] The act was effective March 10, 1967, and the 1968 amendment thereof, on June 13, 1968.

for the apportionment of county Boards of Supervisors, prescribed the size of said boards, and indicated the manner of their election. Section 1 of the original act is of primary relevance to the issue presented and read as follows:

"On or before May 15, 1967, and in subsequent years within 60 days after the publication of the latest United States official decennial census figures, the county apportionment commission in each county of this state shall apportion the county into not less than 5 nor more than 35 county supervisor districts as nearly of equal population as is practicable and within the limitations of section 2. *In counties under 75,000, upon the effective date of this act, the boards of supervisors of such counties shall have not to exceed 30 days into which to apportion their county into supervisor districts in accordance with the provisions of this act.* If at the expiration of the time as set forth in this section a board of supervisors has not so apportioned itself, the county apportionment commission shall proceed to apportion the county under the provisions of this act." (Emphasis added.)

This section was amended by 1968 PA 153 (given immediate effect June 13, 1968) to read as follows:[6]

"On or before May 15, 1967, and in subsequent years within 60 days after the publication of the latest United States official decennial census figures, the county apportionment commission in each county of this state shall apportion the county into not less than 5 nor more than 35 county supervisor districts as nearly of equal population as is practicable and

_____

[6] In the time intervening between the original act and the first amendment thereto, the Michigan Supreme Court ruled the act unconstitutional and then reversed its decision in view of the decision of the United States Supreme Court in *Avery* v *Midland County*, *supra*. *Advisory Opinion re Constitutionality of PA 1966, No 261*, 379 Mich 55 (1967) and 380 Mich 736 (1968).

within the limitations of section 2. *In counties under 75,000, upon the effective date of this act, the boards of supervisors of such counties shall have not to exceed 30 days into which to apportion their county into supervisor districts in accordance with the provisions of this act.* If at the expiration of the time as set forth in this section a board of supervisors has not so apportioned itself, the county apportionment commission shall proceed to apportion the county under the provisions of this act. Notwithstanding any other provision of law, the initial plan for apportionment of the boards of supervisors shall be filed not later than 4 p.m. June 25, 1968. In any county in which a plan is not filed by 4 p.m. on June 25, 1968, 7 supervisors shall be elected at large in 1968 for 2-year terms. In 1968 only, the deadline for filing nominating petitions or filing fees shall be 4 p.m. July 2, 1968. Because of the necessity of insuring orderly election procedures for the year 1968, in no event will litigation affect, alter, change, amend or delay any apportionment plan adopted under this act insofar as 1968 supervisor elections are concerned." (Emphasis added.)

Section 1 was again amended by 1969 PA 137 (effective March 20, 1970), and presently states:

"Within 60 days after the publication of the latest United States official decennial census figures, the county apportionment commission in each county of this state shall apportion the county into not less than 5 nor more than 35 county commissioner districts as nearly of equal population as is practicable and within the limitations of section 2. *In counties under 75,000, upon the effective date of this act, the boards of commissioners of such counties shall have not to exceed 30 days into which to apportion their county into commissioner districts in accordance with the provisions of this act.* If at the expiration of the time as set forth in this section a board of commissioners has not so apportioned itself, the

county apportionment commission shall proceed to apportion the county under the provisions of this act." (Emphasis added.)

The issue which we must determine is whether § 1 of the County Reapportionment Act granted county boards of commissioners in counties having less than 75,000 population in 1960 a 30-day period following publication of each official United States decennial census in which said boards could apportion themselves, or whether this option was restricted to the 30-day period following the effective date of the original act. Either result is plausible upon a simple reading of the language of § 1. Where, as here, statutory language is susceptible to two differing interpretations and is of sufficiently indefinite meaning that reasonable minds can and do disagree as to its true construction, interpretation of the statute in question is a proper function of this Court.[7]

Where a statute is sufficiently ambiguous to necessitate judicial interpretation, the primary duty of the courts is to ascertain the intention of the Legislature by examination of the statutory language, the subject matter under consideration, the scope and purpose of the act, other relevant statutes, and legislative history. *Crawford* v *School District No 6,* 342 Mich 564 (1955). All other rules of statutory construction are ancillary to this primary duty, and serve only as guides to assist the courts in determining legislative intent with a greater degree of certainty. *Van Antwerp* v *State,* 334 Mich 593 (1952).

1. *Intent As Manifested in Legislative Proceedings.*

One important method of determining legislative

---

[7] *McCann* v *Terhune,* 12 Mich App 364 (1968); *City of Lansing* v *Lansing Twp,* 356 Mich 641 (1959).

intent in cases of statutory ambiguity is to review legislative journals which chronicle the legislative history of the act in question. *Liquor Control Commission* v *Fraternal Order of Eagles, Aerie No 629,* 286 Mich 32 (1938). Amendments, modifications, and changes in the frame of a bill during its passage may also be considered as evidence of intent. 82 CJS, Statutes, § 355, p 752. Since legislative proceedings are especially indicative of intent in the instant case, a somewhat detailed review of legislative history is necessary.

On February 17, 1966, the House Committee on Apportionment reported out its substitute apportionment bill with recommendation for adoption.[8] After certain amendments were adopted[9] the substitute bill was passed on third reading. Representative Stempien, chairman of the Committee on Apportionment, declared that the bill was designed to reorganize "Michigan's archaic system of county government" by establishing "workable machinery under which the rule of equal population apportionment for county government can be implemented immediately".[10] Many of the votes against the bill were explained by the fact that the measure was technically unconstitutional at the time of passage, since it contravened Const 1963, art 7, § 7, and the Michigan Supreme Court had not yet held said constitutional provision violative of the United States Constitution.

The important fact from these initial deliberations is that at no time before House passage of the County Apportionment Act on March 15, 1966, did that body consider or even contemplate the second and

---

[8] *House Journal 1966,* pp 387–391.
[9] *Ibid,* pp 446–447, 689–694, 702.
[10] *Ibid,* p 752.

third sentences of § 1 of said act. Section 1 of the House bill then contained one sentence which was essentially the same as the first sentence of the present § 1, and gave apportionment power exclusively to the county Apportionment Commissions with no thought of, nor provision for, a 30-day self-apportionment option in favor of the county Boards of Supervisors.

On March 16, 1966, the House version of the bill was transmitted to the Senate and referred to the Senate Committee on Municipalities.[11] On April 7, 1966, the Senate committee reported the bill out with amendments, and recommended passage.[12] It is significant that there was no mention at this time of adding sentences 2 and 3, containing the 30-day option, to § 1 of that bill.

Thereafter, Senator Schweigert on April 12, 1966, introduced an extremely important substitute apportionment bill.[13] Sections 1 and 4 of this bill are espicially relevant to the instant case and read as follows:

"Sec. 1. Within 60 days after the effective date of this act and in subsequent years within 60 days after the publication of the latest United States official decennial census figures, each county board of supervisors shall apportion themselves according to the provisions of this act.

"Sec. 4. Upon failure of a county board of supervisors to apportion themselves within the time limits and conditions imposed by this act, there shall be created a county apportionment commission." *Senate Journal 1966,* pp 850, 852.

The Schweigert bill thus contained the first suggestion offered in either the House or the Senate

---

11 *Senate Journal 1966,* p 502.
12 *Ibid,* p 802.
13 *Ibid,* pp 849–855.

that county Boards of Supervisors should self-apportion, with county Apportionment Commissions being formed only if county boards failed to apportion themselves. Furthermore, the Schweigert bill was admirably clear in expressing its intent that county boards would have exclusive self-apportionment power after *every* United States official census publication.

On April 13, 1966, sentences 2 and 3 of the present § 1 made their first appearance as amendments added to the single sentence comprising § 1 of the House bill.[14] On April 14, Senator Schweigert offered his substitute bill, but it failed.[15] The Senate then passed its version of the House bill, including the addition of sentences 2 and 3 to § 1 of said bill.[16]

The first House-Senate Conference Committee report recommended eliminating the 30-day option language from the Senate version of the bill.[17] This report was approved by the House,[18] but was rejected by the Senate.[19] A second conference report modified the 30-day option language to apply only to counties under 75,000 population,[20] and this report was adopted by both houses.[21]

### 2. *Intent As Manifested In The Language And Structure of the Statute Itself*

While legislative proceedings are helpful in determining intent relative to ambiguous statutes, insight into legislative intent can also often be ob-

---

[14] *Ibid,* pp 876–877. Sentences 2 and 3 as introduced would have exempted counties under 370,000 in population in 1960 leaving only the Genesee, Macomb, Oakland, and Wayne boards of county commissioners to be apportioned by the county apportionment committee.

[15] *Ibid,* pp 900–906.

[16] *Ibid,* p 907.

[17] *Ibid,* pp 1376–1378.

[18] *House Journal 1966,* pp 2498–2501.

[19] *Senate Journal 1966,* p 1402.

[20] Census figures for 1960 indicate that 65 of Michigan's 83 counties have populations under 75,000.

[21] *House Journal 1966,* pp 2998–3000; *Senate Journal, 1966,* p 1991.

tained by an analysis of statutory language in the context of the entire act and its amendments. *People v Babcock*, 343 Mich 671 (1955); *Lee v Employment Security Commission*, 346 Mich 171 (1956). An analysis of § 1 of the County Apportionment Act discloses the following facts:

a) The first sentence of the original § 1 stated:

"On or before May 15, 1967, and in subsequent years within 60 days after the publication of the latest United States official decennial census figures, the county apportionment commission in each county of this state shall apportion the county *   *   * ."

This language explicitly provided a continuing mechanism by which county Apportionment Commissions would function after each decennial census. It is significant that the Legislature did *not* insert similar language in sentence 2 of § 1. Failure to do so suggests that the Legislature did not intend the county Boards of Supervisors to have a decennially-recurring option of self-apportionment.

b) The second sentence of original § 1 stated:[22]

"In counties under 75,000, *upon the effective date of this act,* the boards of supervisors of such counties shall have not to exceed 30 days in which to apportion their county into supervisor districts *   *   * ." (Emphasis added.)

The question immediately presented is whether the phrase "upon the effective date of this act" modifies "in counties under 75,000" or instead modifies "the boards of supervisors of such counties". The Attorney General's letter-opinion necessarily implies that the phrase in question modifies "in counties under 75,000". There are, however, several valid arguments against such a construction:

_____

[22] Language in the present act is identical, except that "commissioner(s)" has been substituted for "supervisor(s)."

(1) Said construction would require a determination that the comma between the words "75,000" and "upon" was inadvertently placed there. If the disputed phrase had been intended to modify and define the time for determining whether a county had under 75,000 inhabitants, grammatical precision would dictate omission of this separating comma. The language should then have read:

"In counties under 75,000 upon the effective date of this act  *  *  *  ."

Since punctuation is an important factor in determining intent[23] and the rules of grammar are presumed to have been known to the Legislature,[24] inclusion of the separating comma suggests that the disputed phrase was not intended to modify the first clause of sentence 2.

(2) Consideration of the first and second sentences of § 1 *in pari materia* shows that the second phrase in sentence 1 modifies the subsequent clause "the county apportionment commission in each county of this state". Since sentences 1 and 2 appear parallel in construction, logic would suggest that the disputed second phrase of sentence 2 also modifies the subsequent clause "the boards of supervisors of such counties" and not the preceding phrase "in counties under 75,000".

(3) Interpretation of the disputed second phrase of sentence 2 as modifying "in counties under 75,000" would mean that all counties having populations under 75,000 as determined by the 1960 census would perpetually have to allow their county Boards of Commissioners first option to apportion, at least upon the meaning accorded the phrase in the Attor-

23 *Kales* v *City of Oak Park,* 315 Mich 266 (1946).
24 *United States* v *Goldenberg,* 168 US 95, 18 S Ct 3; 42 L Ed 394 (1897).

ney General's letter-opinion. This would remain true even if a county tripled its population from one census period to the next. Such a result appears contrary to the entire tenor of the act.

(4) A reading of the entire County Apportionment Act shows that there is no further reference to county Boards of Commissioners as apportioning entities subsequent to the § 1 reference. If the Legislature had intended a perpetual sharing of apportioning power between Apportionment Commissions and county Boards of Commissioners, reference to *both* bodies would have been made in subsequent sections relating to apportionment procedures. Instead, these sections refer only to the county Apportionment Commission as the apportioning authority. This suggests that the Legislature intended the county Apportionment Commission to have sole apportioning power after the 1970 census.

(5) In determining the time at which the 30-day option for self-apportionment begins to run, the only logical conclusion is that the phrase "not to exceed 30 days" in sentence 2 of § 1 refers to, and is triggered by, the phrase "upon the effective date of this act", which appears earlier in the same sentence. This interpretation is supported by the so-called "doctrine of the last antecedent", which provides that qualifying words and phrases refer solely to the last antecedent where no contrary intention appears.[25]

The Attorney General's letter-opinion, however, requires a determination that the phrase "not to exceed 30 days" in sentence 2 relates back to the first part of sentence 1, "within 60 days after the publi-

[25] 2 Sutherland, Statutory Construction, 3d ed, § 4921, pp 448–449.

cation of the latest United States official decennial census figures." Such an interpretation violates the foregoing rule of statutory construction.

The Attorney General's belief that county Boards of Commissioners enjoy a continuing 30-day option to self-apportion is founded upon the premise that although the Legislature has twice amended § 1, sentences 2 and 3 thereof have remained intact, thus allegedly manifesting legislative intent that the 30-day option continue in effect. Although this premise may be entitled to some weight as a rule of statutory construction, it would be much more compelling if the Legislature had retained the disputed language *subsequent to a judicial interpretation thereof.* *Van Antwerp* v *State,* 334 Mich 593 (1952). Here, however, there was no construction of the statutory language prior to legislative amendment.[26]

---

[26] This Court did on October 23, 1968, invalidate an apportionment plan adopted by the Allegan County Board of Supervisors, and in establishing guidelines for future apportionment procedures within Allegan County (a county of less than 75,000 population), we stated:

"Our finding that Plan A is invalid requires that the Allegan County Board of Supervisors be reapportioned *by the county apportionment commission* in accordance with the mandatory guidelines specified in PA 1966, No 261, § 4.

"In the event the official published figures of the 1970 United States official census are not available in time *for the county apportionment commission* to formulate and adopt an apportionment plan for the 1970 primary election, that election and the 1970 general elections may be held under Plan A  *  *  *  .  " [Emphasis added.] *In re Apportionment of Allegan County Board of Supervisors—1968,* 13 Mich App 692, 696, 697 (1968).

In an unpublished order regarding the apportionment of the Cass County Board of Commissioners, the Court ordered the county apportionment commission "to apportion Cass County immediately upon the publication of the 1970 U.S. Official Decennial Census". Neither case is particularly helpful to our decision herein, since the question of who would do the work of reapportionment was never raised in those cases; this Court merely assumed that the board of county commissioners was only accorded the single opportunity to reapportion and that thereafter the responsibility would fall to the county apportionment commission.

In accordance with these two decisions, the Attorney General advised both Allegan and Cass counties that they would be required to apportion in accordance with the directions of this Court rather

It should be noted that the first phrase of the original § 1, "on or before May 15, 1967", was left intact *after* § 1 was first amended by 1968 PA 153 (effective June 13, 1968). One might argue that the survival of that language indicated legislative imputation of some continuing effect thereto. Such an argument would clearly be absurd, since it is obvious that the words, "on or before May 15, 1967", were obsolete at the time of first amendment. This language was undoubtedly retained inadvertently, and was in fact deleted during the second amending process in 1969.[27] Sentences 2 and 3 of § 1 may similarly be considered obsolete and have escaped deletion only by virtue of legislative inadvertence, just as did the first few words of sentence 1. As stated in 82 CJS, Statutes, § 343, pp 687–688:

"While, as a general rule, every word in a statute is to be given force and effect, * * * unnecessary words or clauses, words inadvertently or mistakenly used, words to which no meaning at all can be attached or words having no meaning in harmony with the legislative intent as collected from the entire act will be treated as surplusage, and will be wholly disregarded in the construction of the act in order to effectuate the legislative intent."

---

than his opinion of December 28, 1970. Overlooked by the Attorney General was Barry County, also under 75,000 in 1960, which this Court also presumed would be reapportioned after the 1970 census by the county apportionment commission:

"If we reviewed the three plans before us and determined that none of them was constitutional, the apportionment commission of Barry County would be required to draft a new plan on the basis of the 1960 census figures. Within a few months, the section of the statute above cited requires that the commission do this very act with the 1970 census figures." *O'Connor v Eckardt*, 23 Mich App 150, 154–155 (1970).

In making its ruling herein, the Livingston County Circuit Court properly relied on this dictum to find the county apportionment commission to be the body vested with the responsibility of reapportioning the board of county commissioners.

[27] 1969 PA 137 (effective March 20, 1970).

Some general principles of statutory interpretation, however, are relevant to the present problem. First, the ultimate legislative intent which must be determined in interpreting an ambiguous statute is that intent existing at the time the act was passed, not the intent expressed by subsequent amendment. *Iron Street Corp.* v *Unemployment Compensation Commission,* 305 Mich 643 (1943); *Detroit Edison Co* v *Department of Revenue,* 320 Mich 506 (1948). Secondly, "ordinarily, subsequent acts of the Legislature cast no light on the intent of the Legislature which originally enacted a statute". *Koppers Coal Co* v *Alderson* 125 W Va 747, 752; 26 SE 2d 226, 229 (1943). Finally, "parts of an amended statute not affected by the amendment will be given the same construction that they received before the amendment". *Brailsford* v *Blue,* 57 Cal 2d 335, 339; 19 Cal Rptr 485, 487; 369 P2d 13, 15 (1962). Measured against these rules, the subsequent amendments to § 1, in and of themselves, are not determinative of the question we must resolve.

The apportionment act established a sophisticated, progressive, comprehensive mechanism designed to eliminate the archaic apportioning procedures then extant. Given the traditional inability of existing political bodies to apportion themselves, it is not likely that the Legislature intended that this newly-developed apportionment mechanism should perpetually be inapplicable to 65 of Michigan's 83 counties. That, however, would be precisely the effect obtained if the 30-day option language in § 1 is interpreted according to the Attorney General's letter-opinion. The county apportionment Commissions could then function in 65 counties only upon failure of the county boards to apportion themselves within the allotted option time.

Senator Schweigert's substitute bill offered the Legislature a clear opportunity to create a mechanism whereby county Boards of Commissioners would have a perpetual option to apportion themselves. This bill, however, was rejected by the Legislature. Nevertheless, the Attorney General's letter-opinion would interpret § 1 as providing a perpetual, exclusive 30-day self-apportionment option for 65 of Michigan's 83 counties, and would thus closely approximate the mechanism suggested in Senator Schweigert's bill, but rejected by the Legislature. It is most unlikely that the Legislature explicitly rejected the latter bill, only to adopt it implicitly by approving § 1 of the present act. Had the Legislature intended to achieve the Schweigert result, it would likely have adopted the Schweigert bill, or at least would have incorporated into present § 1 the explicit Schweigert language regarding perpetuity of the 30-day option.

We consequently hold that sentences 2 and 3 of § 1, added as the record demonstrates as a concession to small-county legislators, were intended to constitute a single exception to reapportionment by the county apportionment commission; they were not intended to provide the boards of county commissioners with a decennially-recurring option to self-apportion. The December 28, 1970, letter-opinion of the Attorney General is therefore overruled and the order of the Livingston County Circuit Court finding that the Livingston County Apportionment Commission has the exclusive right and responsibility to reapportion the board of county commissioners is affirmed. The Attorney General is directed to advise the Livingston County Apportionment Commission forthwith as to the date of official publication of the United States census so that it

may measure the time provided for reapportioning the Livingston County Board of County Commissioners in accordance with the County Reapportionment Act.

No costs, a public question having been involved.