# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2322

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| State of Missouri; Secretary of State, | * | |
| Robin Carnahan; Attorney General | * | |
| of the State of Missouri; Office of | * | |
| the Governor, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 10, 2008
Filed: July 29, 2008

_____

Before RILEY, GRUENDER, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

The United States brought suit against the State of Missouri and the Missouri Secretary of State in her official capacity[1] (collectively, "Missouri"), alleging Missouri

---

[1]Pursuant to the National Voter Registration Act of 1993 (NVRA), "[e]ach state shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." 42 U.S.C. § 1973gg-8. Missouri has designated its Secretary of State to perform this function. See Mo. Rev. Stat. § 115.136(1).

was in violation of its obligations under the National Voter Registration Act of 1993 (NVRA). The district court found Missouri met its NVRA obligation to make a reasonable effort to conduct a general program of voter list maintenance. To the extent some NVRA violations existed, the district court found those violations were the responsibility of individual local election agencies (LEAs), and Missouri was not directly responsible for enforcement of the NVRA against the LEAs. The district court recognized Missouri must do more than enact statutes to comply with the NVRA, and must make a reasonable effort to coordinate state responsibilities. The district court therefore granted summary judgment in favor of Missouri on "any claim by the United States which seeks to hold Missouri responsible for enforcement of the NVRA against local election authorities," but allowed additional discovery for the United States to make its case that Missouri's compliance was unreasonable.

After discovery, the district court found Missouri reasonably met its obligation to "conduct a general program" under the NVRA, and granted summary judgment to Missouri on all claims. In making this decision, the district court declined to admit, for the truth of the matters asserted therein, responses contained in surveys of the LEAs, finding the survey responses were hearsay. The district court allowed the survey statements only for the limited purpose of showing Missouri's knowledge of possible NVRA violations by the LEAs.

On appeal, the United States argues the district court erred in its interpretation of the NVRA. The United States also challenges the district court's decision to exclude LEA survey responses from evidence. We affirm in part, reverse in part, and remand for reconsideration.

I.    BACKGROUND
A.    Underlying Facts and the United States Complaint
The United States filed suit against Missouri, alleging Missouri was in noncompliance with its responsibilities under the NVRA. Of particular significance

-2-

to this appeal, the United States alleged Missouri failed to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [death or change in residency]," pursuant to 42 U.S.C. § 1973gg-6(a)(4).

The district court examined Missouri's actions to comply with the NVRA and Missouri's actions between 1996 to 2004 to attempt to remove ineligible voters from the voter rolls. In its findings of fact, the district court explained Missouri had, among other things, (1) enacted a law amending Missouri's statutory scheme regarding voter registration and list maintenance; (2) through state law, required "that the systematic removal of . . . ineligible voters from voter . . . lists must be completed at least 90 days [before] election[s] for federal office[s]"; (3) "provided for the removal of . . . voters based on death, felony conviction, or mental incapacity"; (4) required local election authorities to conduct a canvass of registered voters every two years; (5) provided for removal of voters who fail to respond to confirmation notices upon completion of the canvass, after the voter has failed to vote "in two consecutive general elections after the date of notice"; (6) developed a centralized voter registration database (CVRD) and numerous local voter registration systems (LVRS); (7) provided for updated voter registration systems throughout the state, including provision "of hardware and software, data conversion and training, and maintenance and support for these computer systems"; (8) coordinated efforts to receive updated information in order to continually update and harmonize the CVRD and LVRS; (9) obtained information from the court systems and the registrars of vital statistics to determine "the identity of [voters who had been] adjudged incapacitated or . . . had been convicted of a felony"; and (10) expended in excess of six million dollars to implement the CVRD.

The district court also delineated Missouri's actions from 2004 to the time of its decision. These steps included (1) taking steps to "eventually replace the CVRD with the Missouri Voter Registration System (MVRS), . . . a single voter . . . database to be directed by the Secretary of State's office; (2) by late 2005, effectively having

109 of 116 local election authorities transfer their data to the MVRS, with all remaining counties scheduled to be completed by January 1, 2006; (3) requiring the MVRS to be updated on a regular basis, and placing responsibility for MVRS maintenance on the Secretary of State; (4) providing publications and also training to LEA authorities at various seminars across Missouri; (5) taking registration surveys from LEAs and submitting compilation reports to the United States Election Assistance Commission as required by federal law; and (6) developing an action plan for encouraging LEA compliance, which included preparation of a guideline manual and regular training for LEA authorities, as well as tracking of registration inconsistencies, and follow-up with LEA authorities where discrepancies are identified.

Throughout the litigation, the registered voters in numerous Missouri counties exceeded the number of eligible voters. The district court found it was unclear whether these discrepancies resulted, in part, from "the NVRA's dual requirements that drivers license applicants must be given an opportunity to register to vote [increasing the numbers of registered voters], and a non-response to a voter canvass requir[ing] a two year delay before names can be removed from the voter registration lists [thus delaying removal of those no longer eligible to vote]." The district court also recognized the federal government had determined twenty-two counties had low numbers of inactive registrants, indicating a possible lack of routine maintenance of voter lists.

In its complaint against Missouri, the United States alleges several provisions of the NVRA, contending Missouri failed to (1) "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the registrant [dying or moving]"; (2) implement a program that was "uniform, nondiscriminatory, and in compliance with the Voting Rights Act"; (3) implement a program that prevented the removal of any person's name from the official list of voters by reason of the person's failure to

vote; and (4) complete, at least 90 days before the date of a primary or general election for federal office, a program to ensure that the names of ineligible voters have been removed from the official list.

## B. The District Court's Grant of Summary Judgment

The district court stated:

> The Government's Complaint is not clear as to what non-compliance conduct it alleges against Missouri. In some respects, it appears the Government alleges that Missouri itself failed to comply with the NVRA. In other respects, it appears the Government is attempting to hold Missouri liable for the conduct of local election authorities that does not comply with the NVRA. The Complaint does not separate its claims into separate counts nor does it explicitly state the alleged wrongful actors.

The district court further explained, "It appears that the Government is seeking, in large part, an order which will require Missouri . . . to enforce the NVRA and the corresponding Missouri statutes against local election authorities." The district court concluded, "Because neither Missouri State law nor the NVRA gives the Secretary of State enforcement authority, summary judgment is granted in favor of [Missouri] on those claims that seek to hold [Missouri] responsible for the enforcement of the NVRA against local election authorities."

In effect, the district court concluded Missouri could only be held responsible for those duties directly assigned to the state, including the requirement it "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [death or change in residency]," pursuant to 42 U.S.C. § 1973gg-6(a)(4). However, the district court acknowledged, "Although Missouri is not required to enforce the NVRA against local election officials, it must itself comply with the terms of the NVRA." The district court allowed additional time for discovery, and subsequently determined Missouri's

efforts to conduct a general program to remove ineligible voters from the rolls was reasonable. The district court granted summary judgment in favor of Missouri.

## II.    STANDARDS OF REVIEW

The parties agree this case represents the functional equivalent of a bench trial. In an "appeal from a civil bench trial, we review the trial court's findings of fact for clear error. Its conclusions of law are subject to de novo review. Mixed questions of law and fact that require the consideration of legal concepts and the exercise of judgment about the values underlying legal principles are also reviewed de novo." Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Insur. Co., 48 F.3d 365, 369 (8th Cir. 1995) (citation omitted). We do review the grant of summary judgment de novo, "viewing the record most favorably to the non-moving party." Tipler v. Douglas County, 482 F.3d 1023, 1025 (8th Cir. 2007).

"We review a district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected [a party's] substantial rights or had more than a slight influence on the verdict." United States v. Two Shields, 497 F.3d 789, 792 (8th Cir. 2007) (citation omitted). We will not reverse if the error was harmless. See Fed. R. Civ. P. 61.

## III.    DISCUSSION
### A.    District Court's Interpretation of the NVRA

The United States characterizes the main issue as, "Whether states can be held accountable for their local subdivisions' violations of Section 8 of the [NVRA], 42 U.S.C. [§] 1973gg-6." This framing of the issue epitomizes the federal government's construction of the NVRA. A different framing of the issues would be: "For *which* violations of Section 8 of the NVRA may states be held accountable when local subdivisions violate the NVRA?" and "In what manner may states be held accountable for the conduct of the LEAs?"

In essence, the United States contends the NVRA places obligations directly on the states (highlighting in bold the term "State" in various passages from the NVRA). Under the federal government's view, if a state delegates any obligation to an LEA, the state remains ultimately responsible for the obligation.

Missouri admits the NVRA directly imposes certain requirements on the states. However, Missouri is quick to note the NVRA imposes different levels of obligations for various requirements. For instance, section 1973gg-6 (the primary section at issue) imposes certain duties on the states. See § 1973gg-6(a) ("In the administration of voter registration for elections for Federal office, each *State* shall— . . ." (emphasis added)). The statute then lists numerous provisions using different verbs to describe the states' responsibilities. Under section 1973gg-6(a)(1), the state must "*ensure* that any eligible applicant is registered to vote in an election." (emphasis added). Under section 1973gg-6(a)(2), the state must "*require* the appropriate State election official to send notice to each applicant of the disposition of the application." (emphasis added). Under section 1973gg-6(a)(3), the State must "*provide* that the name of a registrant may not be removed from the official list of eligible voters except [under specified circumstances]." (emphasis added). Under section 1973gg-6(a)(4) (of most importance in this case), the state must "*conduct* a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reasons of [death or change of residence]." (emphasis added). Under §1973gg-6(a)(5), the state must "*inform* applicants [of certain provisions]." (emphasis added). Finally, under section 1973gg-6(a)(6), the state must "*ensure* that the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public." (emphasis added).

Under the plain language of the statute, states must take specific actions. Some of these provisions envision delegation, and do not require the states to do more than delegate. For example, Congress expressly used the term "ensure" for the requirement that "the identity of the voter registration agency through which any particular voter

is registered is not disclosed to the public." See §1973gg-6(a)(6). Missouri is directly responsible for ensuring this identity remains undisclosed, and if Missouri delegated this responsibility, it could not avoid liability for any failure to maintain such non-disclosure. The same would be true for the provision "ensur[ing] that any eligible applicant is registered to vote in an election." See §1973gg-6(a)(1).

The United States claims Missouri has violated §1973gg-6(a)(4). This provision requires that Missouri "*conduct* a *general program* that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [death or change in residency]." By its plain language, this requirement envisions the states will actively oversee a general program wherein many of the duties not specifically assigned to the states may be delegated. Unlike the term "ensure" which indicates a direct non-delegable state responsibility, the term "require" may indicate a responsibility to do little more than pass a mandatory law. The phraseology "*conduct* a *general program* that makes a reasonable effort," §1973gg-6(a)(4), represents some middle ground. Nonetheless, this "conduct" terminology clearly envisions Missouri will actively oversee the general program.[2]

---

[2]The Elections Clause provides delegation for prescribing rules governing federal elections. See U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." (emphasis added)). Missouri contends, although Congress has authority to disrupt the federal/state balance of authority over elections, in order to do so, Congress "must make its intention to do so unmistakably clear in the language of the statute." (quoting Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991)). The United States distinguishes Gregory, arguing the issue before the Court in Gregory, unlike the case before us, "involved the authority of states 'to determine the qualifications of their most important government officials.'" (quoting Gregory, 501 U.S. at 463). The question in Gregory was whether the Missouri constitutional requirement that state judges retire at seventy violated the Age Discrimination in Employment Act. Id. at 455. The United States further points out "the regulation of federal elections is not one of the inherent powers that the Tenth Amendment reserves to the states." (citing U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 802-05 (1995)).

After all, the term "conduct" is an active verb, encompassing the concept of providing leadership. See Webster's Third New Intn'l Dictionary 474 (1993) (defining the term as meaning, inter alia, "to bring by or as if by leading"; "to lead as a commander"; "to have the direction of"; "to direct as leader the performance or execution of"; and "to act as leader or director"). Under the NVRA's plain language, Missouri may not

---

We recognize the direct federal regulation of state officials' election qualifications raises far greater federalism concerns than congressionally imposed requirements for federal elections. We also recognize regulation of federal elections could not have been technically reserved to the states by the Tenth Amendment, when such federal elections did not exist before the Constitution was established. The Supreme Court has described the federal Elections Clause as a "delegation[] of power to the States to act with respect to federal elections." Id. at 805. The Court was discussing the power of the states to add qualifications for federal representatives, and explained, "*In the absence of any constitutional delegation* to the States of power to add qualifications to those enumerated in the Constitution, such a [state] power does not exist." Id. (emphasis added). Thus, although the regulation of federal elections is not one of the inherent powers that the Tenth Amendment *reserves* to the states, see id. at 802 (explaining that the Constitution only "'reserve[s powers of the states] which existed before" the Constitution was established), the text of the Elections Clause may arguably describe "the usual constitutional balance between the States and the Federal Government," Gregory, 501 U.S. at 460 (citations and internal quotation marks omitted), such that, "If Congress intends to alter [that balance], it must make its intention to do so unmistakably clear in the language of the statute." Id. (citations and internal quotation marks omitted). On the other hand, the Elections Clause permits Congress to "make or alter" elections of "Senators and Representatives" "at any time," which may not be a traditional federalism issue making Gregory applicable.

However, we need not decide whether the plain statement rule applies in the context of the Elections Clause. The NVRA utilizes the mandatory "shall" followed by an active verb, requiring the states to "conduct a general program." We see no ambiguity in Congress's intent to place this additional requirement on the states in their conduct of federal elections. Particularly given the limited nature of our reversal, we are not endorsing the United States's attempt to have the federal courts order Missouri to enforce the NVRA directly.

delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted.

The district court correctly understood the key issue is whether or not Missouri has met *its* express obligations under the NVRA. However, the district court misunderstood the relevance of the LEAs' actions or inactions regarding Missouri's compliance with the NVRA. The district court found Missouri could not be "[held] responsible for enforcement of the NVRA against local election authorities." This determination was technically correct. The plain language of the NVRA provides a right of enforcement to only two categories of plaintiffs—the United States and "[a] person who is aggrieved by a violation of [the NVRA]." § 1973gg-9(a) and (b). The State of Missouri would not necessarily be a "person . . . aggrieved by" a violation of the NVRA. The statute envisions the federal government predominantly will enforce the NVRA.[3]

Although Missouri cannot be required to *enforce* the NVRA against the LEAs, any lack of LEA compliance remains relevant to determining whether or not Missouri is reasonably "conduct[ing] a general program." Other remedies besides ordering Missouri to enforce the NVRA against the LEAs may remain. For instance, if the district court determines a lack of LEA compliance renders Missouri's efforts to conduct a general program unreasonable, it could order Missouri either to (1) develop different or improved methods for *encouraging* LEA compliance, or (2) assume direct responsibility for some or all of the activities needed to remove ineligible voters from

---

[3]The United States also pitches a policy plea, asking us to hold Missouri responsible for enforcement because it will be much more difficult for the federal government to enforce the NVRA against individual LEAs. This plea fails to recognize (1) the federal government has taken enforcement actions directly against the LEAs in the past; (2) after one or two LEAs are held liable others are more likely to fall in line without lengthy litigation; and (3) it is not the place of the courts to "rework" a statute to simplify enforcement when Congress could have written the legislation differently. This is a policy decision for Congress. We decline to shift this cost and burden to the states without clear direction from Congress.

-10-

the voter rolls (i.e., cease delegating NVRA responsibilities to the non-complying LEAs).

We do not suggest what equitable relief, if any, may be appropriate, as the district court sits in a much better position to make this determination. We only provide the above options to clarify the possible realm of the actions. The courts, of course, should refrain from micromanaging the state and its agencies. See Angela R. v. Clinton, 999 F.2d 320, 326 (8th Cir. 1993) ("Federal courts operate according to institutional rules and procedures that are poorly suited to the management of state agencies."). "[A]ppropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief." Rizzo v. Goode, 423 U.S. 362, 379 (1976) (citation omitted).

The district court provided a lengthy analysis of Missouri's attempts to comply with the NVRA, finding Missouri met its obligation for a "reasonable effort" to "conduct a general program . . . ." On remand, the district court is not bound to reach a contrary conclusion. Rather, our reversal requires only that the district court also consider any lack of LEA compliance and determine whether any such noncompliance renders Missouri's effort to "conduct a general program" unreasonable in removing the names of ineligible voters.

### B. Exclusion of Canvassing Reports as Hearsay

Under the NVRA, the Election Assistance Commission (EAC) makes reports to Congress in odd-numbered years. See § 1973gg7(a)(3). In 2005, the EAC sent survey forms to Missouri late. The EAC denied Missouri's request for an extension of time and told Missouri to do the best it could. The bulk of Missouri's work fell on one person. Missouri compiled survey responses from the LEAs into one report, and sent the report to the EAC.

The district court allowed the survey responses into evidence to demonstrate Missouri had notice of possible problems, but did not admit the responses for the truth of the matters asserted therein, finding the response statements were hearsay. The United States challenges this finding. The court's decision to deny admission of the survey responses for their truth represents a close evidentiary question. Given the deferential standard of review, we affirm. See United States v. Hyles, 479 F.3d 958, 968 (8th Cir. 2007) (reviewing evidentiary rulings for "*clear* abuse of discretion" (emphasis added)).

First, the United States argues the survey responses represent statements of a party opponent, or statements of a party agent. The United States relies, in part, upon the general rule that "[t]he actions of local government are the actions of the State," (quoting Avery v. Midland County, 390 U.S. 474, 480 (1968) (emphasis omitted)). The Avery Court made this pronouncement in the context of the Fourteenth Amendment. See id. As Missouri contends, "Unless a political subdivision of a state is simply the arm or alter ego of the state, it may sue or be sued pursuant to the same rules as any other corporation," (quoting Gilliam v. City of Omaha, 524 F.2d 1013, 1015 (8th Cir. 1975) (internal citations and quotation marks omitted)). Missouri explains the Missouri county election officials are not simply state-appointed officials at the county level. Rather, county election officials are independently elected officials, paid by and reporting to their respective county commissions. The United States has directly sued the local LEAs in the past, and arguably views the LEAs, at least to some extent, as independent entities. See, e.g., United States v. Board of

Election Commissioners of the City of St. Louis, Case No. 4:02-CV-1235 (E.D. Mo. 2002) (resolved by consent decree). Because this evidentiary question is certainly debatable, we cannot say the district court abused its considerable discretion.

Second, the United States argues the survey responses qualify as adoptive admissions. However, in determining whether adoption of a statement has occurred, an examination must be conducted into the surrounding circumstances to see whether those circumstances indicate approval of the statement. See 2 Kenneth S. Brown et al., McCormick on Evidence 209 (6th ed. 2006). Missouri merely passed the LEAs' survey responses along to the federal government, with no indication the state was adopting the truth of the responses. Missouri even indicated additional time was needed, thus demonstrating a lack of certainty in the accuracy of the responses. Again, given the deferential standard of review, and the surrounding circumstances here, we cannot say the district court clearly abused its discretion by declining to recognize the survey responses as adoptive admissions.

Finally, the United States argues the survey responses fall under either the public records exception or the business records exception to hearsay. Fed. R. Evid. 803(8)(A) & (6). Both of these exceptions require the records demonstrate "trustworthiness." See Fed. R. Evid. 803(8)(A) & (6). As previously noted, the information for the survey responses was hastily gathered, and Missouri requested an extension of time. Declarations by numerous LEAs indicated the survey responses were inaccurate; for example, "The Survey response . . . is incorrect . . . .," and the identification of unexplained discrepancies between the survey responses and compiled data. Although the admissibility of the LEAs' reporting statements for their trustworthiness is arguable, the district court did not abuse its broad discretion by allowing the LEAs' survey responses only to demonstrate Missouri's knowledge of possible problems.

## IV. CONCLUSION

We reverse the district court's orders granting summary judgment, and remand for reconsideration in accordance with this opinion. The district court's evidentiary rulings are affirmed.

_____